**In re John E.S. MOHR, Shelly I. Staddon, Debtors.**

No. 09–30487.

United States Bankruptcy Court,
S.D. Ohio,
Western Division,
at Dayton.

March 15, 2010.

Lester R. Thompson, Dayton, OH, for Debtors.

Jeremy Shane Flannery, Mary Anne Wilsbacher, Office of the United States Trustee, Columbus, OH, for U.S. Trustee.

## DECISION DENYING MOTIONS TO DISMISS FILED BY THE UNITED STATES TRUSTEE AND DON WRIGHT REALTY

LAWRENCE S. WALTER, Bankruptcy Judge.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the General Order of Reference entered in this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). This matter is before the Court on the motions to dismiss pursuant to 11 U.S.C. § 707 filed by the United States Trustee ("UST")

and Don Wright Realty [docs. 41 and 49]; the responses filed by Debtors John E.S. Mohr and Shelly I. Staddon ("Debtors") [docs. 60 and 61]; and supporting documents filed by the Debtors and the UST [docs. 75 and 80]. On September 3, 2009, the court held a hearing to consider the matters raised by the parties in the motions to dismiss and related documents. Following the hearing, the court set a briefing schedule and briefs were filed by the parties [docs. 83, 84 and 88].

This case turns on the appropriate calculation and scheduling of liability on a prepetition commercial lease: whether the debt is more appropriately scheduled at the full accelerated amount or the reduced amount after applying the formula set forth in 11 U.S.C. § 502(b)(6). The reduced amount must pertain if the Debtors are to qualify as having "primarily consumer debts" thereby triggering the abuse provisions of § 707(b) and possible conversion or dismissal of their bankruptcy case. Because the court determines that the limiting formula of § 502(b)(6) does not apply to this threshold inquiry under § 707(b), and because there is no applicable alternative basis for dismissal under § 707(a), the court denies the motions to dismiss this case.

### BACKGROUND

Prior to the Debtors' bankruptcy filing, Debtors John Mohr and Shelly Staddon owned and operated a business on commercial property leased from Don Wright Realty. The five-year lease agreement was entered into on July 17, 2002. An addendum to the lease extended its term until November 30, 2012.[1] The Debtors stopped paying rent in December of 2008. When the Debtors closed their business, nearly four years remained on the lease.

On January 1, 2009, Debtors filed a voluntary Chapter 7 petition. In their schedules, the Debtors listed assets totaling $813,950.37. The Debtors further scheduled $411,644.31 in secured claims, $5,570.90 in unsecured priority claims, and $484,001.91 in unsecured, non-priority claims. Of the $484,001.91 in unsecured, non-priority claims listed in Schedule F, $340,000 was related to the Debtors' commercial lease with Don Wright Realty. This amount represented the "balance left due," including the rent and additional costs that would have been incurred through November 2012.

As a result of listing what the Debtors believed was the full balance owed on the lease, the dollar amount of their business debts exceeded their consumer debts. Consequently, they categorized their debts as "primarily business" in nature on their petition. On June 1, 2009, the UST filed a motion to dismiss the Chapter 7 case pursuant to 11 U.S.C. §§ 707(a) and 707(b); Don Wright Realty subsequently filed its own motion to dismiss, containing similar arguments, on June 16, 2009. The UST and Don Wright Realty (collectively "movants") assert that the Debtors erroneously inflated the amount of debt owed to Don Wright Realty by scheduling the full amount owed on the lease as opposed to the amount of the claim that would be allowable under 11 U.S.C. § 502(b)(6).[2]

---

1. The addendum provided that the Debtors were to pay $4,583.33 per month, as well as fees for common area maintenance "CAM," real estate taxes and insurance costs on a pro rata rate.

2. The UST calculates Don Wright Realty's potential allowable claim under 11 U.S.C.

§ 502(b)(6) to be capped at $79,750.08 while Don Wright Realty calculates its potential claim to be capped at $86,840.96. The court's decision is limited to whether the lease debt should be capped for purposes of determining applicability of § 707(b) in this case. The exact figures are not relevant for

Had the Debtors utilized § 502(b)(6) to cap the lease debt on their schedules, the Debtors' total debt would have been primarily consumer debt.

The UST argues that if the Debtors have primarily consumer debts, then § 707(b) applies requiring an analysis of whether the Debtors' case would constitute an abuse under the means test and considering the totality of their financial circumstances.[3] The UST asserts that the Debtors have a relatively high disposable income which could be used to pay creditors a substantial amount of their claims over a period of years outside of bankruptcy or in a converted case.

Alternatively, even if § 707(b) is inapplicable, both the UST and Don Wright Realty assert that the Debtors' ability to pay creditors out of future income is a basis for dismissal of the Debtors' case for "bad faith" pursuant to 11 U.S.C. § 707(a). As additional support for their bad faith argument, the movants again note the Debtors' failure to properly cap the lease debt in their schedules.

The Debtors disagree with the movants and assert that they properly calculated and scheduled the lease debt owed to Don Wright Realty. At the hearing, Debtor John Mohr testified as to how he arrived at the $340,000 amount as the balance due on the lease. He stated that the number was provided to him directly by a representative of Don Wright Realty during discussions between him and the lessor

prior to the bankruptcy filing. The Debtors argue that their high valuation of the lease debt is further supported by Don Wright Realty itself which filed a proof of claim in the bankruptcy case listing the amount due on the lease as $587,336.17 [Claim No. 7–1] although the creditor later amended its claim to a much lower amount [Claim No. 7–2].[4] The Debtors assert that while § 502(b)(6) may apply to limit Don Wright Realty's claim for allowance purposes, it is not intended to cap debt for determining preliminary bankruptcy issues like a debtor's ratio of business to consumer debts pursuant to § 707(b).

## LEGAL ANALYSIS

### A. Whether the Debtors Properly Calculated Their Lease Debt to Determine the Applicability of § 707(b)

 Upon the timely filing of a motion to dismiss by a party in interest, such as that filed by the UST in this case, a court may dismiss a Chapter 7 debtor's case "whose debts are primarily consumer debts" if the case would constitute an abuse. 11 U.S.C. § 707(b)(1). Because of the statutory language limiting the provision to debtors with primarily consumer debts, it has been held that the abuse sections of § 707(b) do not apply if the debtor has primarily business debts. *In re Marshalek,* 158 B.R. 704, 707 (Bankr. N.D.Ohio 1993). A debtor will be considered to have "primarily" consumer debts

---

purposes of this decision; either figure would render the Debtors' total debt primarily consumer in nature.

**3.** Like the UST's motion, Don Wright Realty's motion asserted a basis for dismissal under both 11 U.S.C. § 707(a) and (b); however, the lessor's § 707(b) claim was untimely. Fed. R. Bankr.P. 1017(e). Consequently, the court disregards arguments raised by Don Wright Realty under § 707(b).

**4.** Following the UST's filing of its motion to dismiss raising the issue of the § 502(b)(6) cap, Don Wright Realty amended its proof of claim lowering the stated amount due on the lease to $86,840.96, the amount that Don Wright Realty believes is allowable once capped by this statutory provision.

when more than one half of the dollar amount of debt owed is consumer in nature.[5] *In re Martens,* 171 B.R. 43, 45 (Bankr.N.D.Ohio 1994).

In this case, the UST filed its motion because it disagrees with the Debtors' determination that they have primarily business debts and their resulting conclusion that the abuse provisions of § 707(b) are inapplicable. The parties' dispute centers on the proper calculation of the lease debt owed to Don Wright Realty and whether the debt should be capped pursuant to 11 U.S.C. § 502(b), a statute governing claims allowance.

Unfortunately, guidance for calculating a lease debt to determine the ratio of a debtor's business to consumer debts pursuant to § 707(b) is minimal. There is little case law dealing with the issue nor has the Sixth Circuit dealt directly with it. Nonetheless, the court finds it significant that the Sixth Circuit has considered the scope of judicial inquiry when making other threshold debt calculations such as those required to determine eligibility for Chapter 13 relief pursuant to 11 U.S.C. § 109(e).

Section 109(e) establishes the eligibility requirements to be a debtor under Chapter 13 of the Bankruptcy Code, including precise limits on the amount of "noncontingent, liquidated" unsecured and secured debts that an eligible debtor may owe at the time of the bankruptcy filing. 11 U.S.C. § 109(e). In *Comprehensive Accounting Corp. v. Pearson (In re Pearson),* the Sixth Circuit held that when making threshold eligibility determinations such as calculating a debtor's debt levels to determine whether they exceed the limits prescribed by § 109(e), a court should rely primarily on the debtor's schedules checking only to see if the schedules were filed in good faith. 773 F.2d 751, 756 (6th Cir.1985). This is based on the theory that such threshold inquiries consider debts as they exist at the time of filing and not after a hearing. *Id.* Furthermore, policy considerations favor preventing threshold inquiries from dominating or unduly delaying the case. *Id.* at 757. Indeed, the "resources of the debtor are almost by definition limited and the means of determining eligibility must be efficient and inexpensive .... [t]o allow an extensive inquiry in each case would do much toward defeating the very object of the statute." *Id.*

Does that mean that threshold calculations of debt based primarily on a debtor's schedules need not match the more precise calculation of debts or claims that occurs through post-petition contested proceedings? In *Pearson,* the Sixth Circuit recognized that the answer to this question was almost certainly yes. *Id.* at 758. The Sixth Circuit determined that the more extensive post-petition proceedings needed to make ultimate conclusions about the precise nature and extent of debts are "relatively immaterial in determining the debtors' financial condition and Chapter 13 eligibility on the date the petition was filed." *Id.; In re Haveron–Quigley,* 1994 WL 502019, at *1 (Bankr.E.D.Pa. Sept. 12, 1994) (noting that "§ 109(e) is concerned with the amount of debts which a prospective Chapter 13 debtor 'owes' not the debts or claims which the debtor will be obliged to pay in a Chapter 13 plan").

■ Although *Pearson* does not have direct application beyond a Chapter 13

---

**5.** A "consumer debt" is defined as a "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). Debts that have a profit-motive are more properly classified as business in nature. *In re Davis,* 378 B.R. 539, 547 (Bankr.N.D.Ohio 2007).

eligibility inquiry, this court concludes that determining a debtor's ratio of business to consumer debts to evaluate the applicability of § 707(b) is a similar type of threshold inquiry. Indeed, the time limits imposed by 11 U.S.C. § 704(b)[6] and Fed. R. Bankr.P. 1017(e),[7] for filing § 707(b) motions demonstrate an intent by Congress and rule makers that the matter be decided early in a case prior to the litigation and other contested processes that determine ultimate debt levels. Moreover, the policy reasons for keeping the focus on the Debtors' scheduled debts to minimize litigation over threshold inquiries and maximize efficiency are certainly applicable.

Nonetheless, the UST cites to interpretations of *Pearson* that allow deviation from a debtor's scheduled debt amounts for threshold inquiries if a lack of good faith is evident or more precise values are readily ascertainable. *See, e.g., In re Smith,* 365 B.R. 770, 780–81 (Bankr.

S.D.Ohio 2007) (noting that the schedules, while the starting point in a § 109(e) analysis, are not dispositive and the court should make its own independent determination of the characterization of a claim); *In re Mannor,* 175 B.R. 639, 641–42 (Bankr.E.D.Mich.1994) (holding that a court can disregard the debtor's scheduled values, even if they are filed in good faith, "when it appears to a legal certainty" that the amount owed is other than what the debtor says). The UST argues that the capped amount of the Debtors' lease debt is easily ascertainable in this case and involves only a simple calculation pursuant to 11 U.S.C. § 502(b)(6). Furthermore, the UST asserts that allowing the Debtors to schedule the full accelerated lease debt and use that amount to calculate their ratio of business to consumer debts would give debtors unbridled authority to manipulate their schedules in any manner favorable to them, a scenario suggestive of bad faith.

6. Section § 704(b), applicable to trustees, states:

(b)(1) With respect to a debtor who is an individual in a case under this chapter—
(A) the United States trustee (or the bankruptcy administrator, if any) shall review all materials filed by the debtor and, not later than 10 days after the date of the first meeting of creditors, file with the court a statement as to whether the debtor's case would be presumed to be an abuse under section 707(b); and
(B) not later than 7 days after receiving a statement under subparagraph (A), the court shall provide a copy of the statement to all creditors.
(2) The United States trustee (or bankruptcy administrator, if any) shall, not later than 30 days after the date of filing a statement under paragraph (1), either file a motion to dismiss or convert under section 707(b) or file a statement setting forth the reasons the United States trustee (or the bankruptcy administrator, if any) does not consider such a motion to be appropriate, if the United States trustee (or the bankruptcy administrator, if any) determines that the debtor's case should be presumed to be an

abuse under section 707(b) and the product of the debtor's current monthly income, multiplied by 12 is not less than—
(A) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner; or
(B) in the case of a debtor in a household of 2 or more individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals.

7. Fed. R. Bankr.P. 1017(e)(1) states:

(1) Except as otherwise provided in § 704(b)(2), a motion to dismiss a case for abuse under § 707(b) or (c) may be filed only within 60 days after the first date set for the meeting of creditors under § 341(a), unless, on request filed before the time has expired, the court for cause extends the time for filing the motion to dismiss. The party filing the motion shall set forth in the motion all matters to be considered at the hearing. In addition, a motion to dismiss under § 707(b)(1) and (3) shall state with particularity the circumstances alleged to constitute abuse.

While the court recognizes the UST's concerns, they are misplaced. First, a debtor does not have unbridled authority to manipulate the scheduling of debt or how it is used in threshold calculations. Instead, a debtor must accurately calculate a debt for these purposes as it exists on the date the petition is filed or face objections, and an independent review by the court, prompted by any indicia that his or her calculation is not in good faith or is not an accurate measure of the debt.[8] At that point, the court will entertain evidence presented by a trustee or other parties in interest contradicting the debtor's schedules to the extent the evidence sheds light on a debt as it exists on the petition filing date. *Smith*, 365 B.R. at 780 (" 'when it appears a debtor did not exercise reasonable diligence or good faith in completing and filing the schedules, the Court may look to other evidence' " to determine eligibility) (further citations omitted); *In re Hatzenbuehler*, 282 B.R. 828, 833 (Bankr. N.D.Tex.2002) (noting that a debtor's schedules may be an imperfect measure of debt and, consequently, a court may consider other evidence and post-petition developments "to the extent (and only to the extent) they shed light on the amount of ... debt actually owed by the debtor *at the time of the filing of the petition*").

■ Second, a review of § 502(b)(6) reveals that, while the cap it places on allowed damages related to a terminated real estate lease may be easy to calculate, its application is not automatic at the time the petition is filed. The statute provides, in pertinent part:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

\* \* \*

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates[.]

---

8. In this case, no party disputes that the $340,000 number in the Debtors' schedules is a good faith valuation of the full accelerated lease debt owed to Don Wright Realty as of the petition filing date pursuant to their contractual agreement with the lessor and state law. Their uncontroverted testimony supports that the number came directly from pre-petition discussions with the lessor itself. The only alleged "manipulation" by the Debtors is whether they should have applied the § 502(b)(6) cap to limit the debt to determine the applicability of § 707(b), an unresolved legal issue that will be addressed by this court. Once resolved, all debtors will have to calculate a lease debt the same way for § 707(b) purposes and will not be able to manipulate the number as suggested by the UST.

11 U.S.C. § 502(a) and (b)(6). The purpose of the cap on terminated real estate lease debts[9] is related to allowance and distribution: to ensure that a landlord is properly compensated for damages due to breach of a lease yet precluded from receiving a distribution for future losses so large as to prevent other general unsecured creditors from recovering a reasonable dividend from the estate. *In re Brown*, 398 B.R. 215, 219 (Bankr.N.D.Ohio 2008).

■ Significantly, this statutory provision, according to its express language, is triggered only upon the occurrence of a post-petition event in the bankruptcy case—a claim objection. 11 U.S.C. § 502(b)(6). *See also* 8 *Collier on Bankruptcy* ¶ 1300.71[2] (15th ed. rev.2006) (noting that the "provisions of subsections 502(b), (c), (d) and (e) are activated only upon the filing of an objection to the claim by a party in interest"). Unless a party objects to a creditor's proof of claim, the § 502(b)(6) cap does not apply and the amount of the creditor's allowed claim could presumably match the full lease debt as scheduled by the Debtors in this case.

■ Because the § 502(b)(6) cap is only activated by optional and unpredictable post-petition bankruptcy events, the court concludes it is not appropriately applied to threshold inquires that are focused on the initial schedules and the calculation of debt existing on the date of the bankruptcy filing. *In re Blair*, 2007 Bankr.LEXIS 4242, at *22 (Bankr.S.D.Ohio Dec. 13, 2007) (noting that "§ 502(b)(6) was not designed to determine eligibility for bankruptcy relief, but instead sets a limit on certain claims for purposes of allowance and distribution from the bankruptcy estate").

The court recognizes that its decision conflicts with two cases cited by the UST to support its point of view, those being *In re Lapke*, 2008 WL 355575, 2008 Bankr.LEXIS 182 (Bankr.D.Neb. Jan. 23, 2008) and *In re Thompson*, 116 B.R. 610 (Bankr.S.D.Ohio 1990). In *Lapke*, the only case cited by the UST that is directly on point, the bankruptcy court determined that the § 502(b)(6) cap should be applied for purposes of deciding the ratio of business to consumer debt. 2008 WL 355575, at *5–6, 2008 Bankr.LEXIS 182, at *12–13. However, *Lapke* was not written by a court within the Sixth Circuit and, consequently, it was not guided by *Pearson* and the focus it places on a debtor's scheduling of debts as they exist on the bankruptcy filing date. Furthermore, *Lapke* does not address the fact that the § 502(b)(6) cap is not automatic and, instead, is only triggered by a post-petition claim objection. For these reasons, the court respectfully rejects *Lapke*.

The second case cited by the UST is the *Thompson* case. In *Thompson*, the court focused on calculating the § 502(b)(6) cap for allowance purposes following a claim objection, but suggested that once the amount of the capped claim was calculated, that same calculation would be used to

**9.** There is some question as to whether the Debtors' lease was terminated or only in default at the time that the Debtors filed their petition [Debtors' Response to Post Hearing Brief, Doc. 88, pp. 4–5]. This issue was not raised by the parties in any substantive manner prior to or at the hearing and will not be addressed by this court. However, it does highlight that the extent to which the § 502(b)(6) cap applies to a real estate lease claim may turn on the facts of a specific case since, by its very language, the cap only applies to damages resulting from termination of the lease. *In re Brown*, 398 B.R. 215, 218 (Bankr.N.D.Ohio 2008) (suggesting that the simple filing of a proof of claim by a lessor does not result in the automatic application of the § 502(b)(6) cap to all or part of the claim; the cap applies only to damages resulting from *termination* of a lease).

determine § 109(e) eligibility for Chapter 13 relief. *Thompson*, 116 B.R. at 611–12. The eligibility issue was not the focus of the decision nor was an ultimate conclusion reached on that issue. *Thompson* does not discuss how and when debts should be valued for § 109(e) eligibility purposes nor does it explain how utilizing the § 502(b)(6) cap would comport with the Sixth Circuit's decision in *Pearson*. Ultimately, the court finds *Thompson* too vague and lacking in substantive analysis to be persuasive on this issue. *Blair*, 2007 Bankr.LEXIS 4242, at *22.

The court acknowledges that declining to apply § 502(b)(6) to threshold debt calculations may appear to indirectly conflict with its prior decision in *In re Fuson*, 404 B.R. 872 (Bankr.S.D.Ohio 2008). In *Fuson*, the court applied 11 U.S.C. § 506(a), used to bifurcate debts into their secured and unsecured components, for § 109(e) purposes even though § 506(a) is a statute utilized in the claims process. 404 B.R. at 876. However, two key differences exist between the application of § 502(b)(6) and the application of § 506(a) to threshold inquiries. First, unlike § 506(a), § 502(b)(6) relies upon a post-petition claim objection to be triggered. Second, § 506(a)'s bifurcation of a debt into its secured and unsecured components is manifest from what a debtor is required to schedule regarding his or her debts as they exist on the date of the bankruptcy filing. *See* Official Bankruptcy Form 6, Schedule D. *See also In re McClaskie*, 92 B.R. 285, 287 (Bankr.S.D.Ohio 1988) (noting that it would be inappropriate for the court to deny the obvious § 506(a) bifurcation as reflected by the debtor's own scheduling of debt and valuation of liened property). There is no clear place to schedule the § 502(b)(6) cap in Official Bankruptcy Form 6 (encompassing the schedules) nor would capping the debt be appropriate; creditors and other parties-in-interest would be left without an accurate calculation of the full accelerated lease debt as it was owed under the terms of the agreement on the petition filing date. Ultimately, the § 506(b)(6) cap is too far removed from a debtor's schedules and requires the court to delve too deep into speculative events beyond the bankruptcy filing date. It is simply incompatible with threshold inquires.

For these reasons, the court concludes that the Debtors properly listed the full amount owed on their commercial lease in their schedules such that they have primarily business debts for purposes of § 707(b). Consequently, the abuse provisions of § 707(b) do not apply in this case.

### B. Whether the Debtors Filed in "Bad Faith" Pursuant to § 707(a)

■■ Alternatively, the UST and Don Wright Realty argue that dismissal of this case is appropriate pursuant to 11 U.S.C. § 707(a) which provides that a bankruptcy court:

> may dismiss a case under this chapter only after notice and a hearing and only for cause, including—
>
> > (1) unreasonable delay by the debtor that is prejudicial to creditors;
> >
> > (2) nonpayment of any fees or charges required under chapter 123 of title 28; and
> >
> > (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521, but only on a motion by the United States trustee.

11 U.S.C. § 707(a). The Sixth Circuit has held that the term "including" as used in § 707(a) is not limiting and that "lack of good faith is a valid basis of decision in a

'for cause' dismissal by a bankruptcy court." *Merritt v. Franklin Bank, N.A. (In re Merritt)*, 211 F.3d 1269 (Table), 2000 WL 420681, at *2 (6th Cir. April 12, 2000); *Indus. Ins. Servs., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1127 (6th Cir. 1991). The Sixth Circuit has further held that " '[t]he facts required to mandate dismissal based upon a lack of good faith are as varied as the number of cases.' " *Zick*, 931 F.2d at 1127 (further citations omitted). Nevertheless, the Sixth Circuit has noted that such bad faith dismissals should not be taken lightly, stating that:

> ... despite its ad hoc nature and the wide variety of situations in which bad faith dismissal is appropriate, bad faith dismissal "should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct or gross negligence."

*Merritt*, 2000 WL 420681, at *2 (quoting *Zick*, 931 F.2d at 1129). *See also In re Weeks*, 306 B.R. 587, 590 (Bankr.E.D.Mich. 2004) (interpreting *Zick* to limit bad faith dismissals to "egregious cases where the debtors motives are clearly inconsistent with the established purpose of the Bankruptcy Code").

According to the movants, § 707(a) supports conversion or dismissal of this case because the Debtors possess the ability to repay a significant portion of their debts out of post-petition income.[10] The movants argue that even if they are prohibited

from evaluating the Debtors' ability to pay pursuant to § 707(b) because the Debtors have primarily business debts, the court can still use the Debtors' ability to pay as a basis for dismissal pursuant to § 707(a).

■ While ability to pay is the primary focus for dismissal under § 707(b)'s abuse test, legislative history suggests that Congress did not intend ability to pay to be a primary consideration under § 707(a). *Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829, 831 (8th Cir.1994) (citing to the House and Senate reports); *Zick*, 931 F.2d at 1127 n. 3; *Novak v. Wagnitz (In re Wagnitz)*, 2004 WL 626821, at *10 (N.D.Ill. Mar. 29, 2004). Significantly, the Sixth Circuit has considered the issue and determined that post-petition ability to repay debts, while relevant to good faith, does not, standing alone, support a dismissal under § 707(a) without the presence of other misconduct. *Merritt*, 2000 WL 420681, at *3.

Following *Zick* and *Merritt*, the court concludes that the Debtors' ability to pay is a factor to consider, but does not support dismissal under § 707(a) in this case because there is no other indicia of bad faith and certainly no evidence of egregious conduct. If the court were to rule otherwise, the UST and other movants could use § 707(a) to circumvent limitations in the application of § 707(b), a provision which clearly contemplates a focused review of a debtor's financial situation and ability to pay for indications of abuse. As one bankruptcy court noted:

> ... to permit a Section 707(b) type inquiry under the rubric of a Section

---

**10.** The UST asserts that the Debtors have disposable income of between $2,000 and $2,400 per month which could be used to pay a significant portion of their unsecured debts over a period of time. The Debtors disagree. At the hearing, the court declined to take evidence on the Debtors' ability to pay and

planned to address this fact issue at a subsequent evidentiary hearing if necessary. Because of the court's resolution of the legal issues leading it to deny the movants' motions to dismiss, a later hearing will be unnecessary.

707(a) dismissal request would countenance easy circumvention of the limitations upon dismissals for [abuse][11] incorporated into Section 707(b).... The limitation of Section 707(b) only to debtors whose debts are primarily consumer debts would be written out of the Bankruptcy Code.

*Perniciaro v. Natale (In re Natale)*, 136 B.R. 344, 352 (Bankr.E.D.N.Y.1992). *See also Weeks*, 306 B.R. at 591 (denying the UST's motion to dismiss pursuant to § 707(a) when the basis, an understatement of income and excessive expenses, was more properly brought under § 707(b) and the UST alleged no other egregious conduct to suggest bad faith).

 In this case, the only evidence offered by the movants of more "egregious" conduct is the manner in which the Debtors scheduled their lease debt without applying the § 502(b)(6) cap and the resulting determination that they have primarily business debts. As this court noted in the prior section of this decision, the Debtors' actions in this regard were entirely appropriate and in good faith. They properly listed the full lease debt in their schedules in an amount that came directly from prepetition discussions with Don Wright Realty. In addition, their conclusion that they had primarily business debts was accurate. None of these facts suggests egregious behavior or provides support for a bad faith determination.

Without more, the movants' evidence of the Debtors' alleged ability to pay is insufficient to support dismissal pursuant to 11 U.S.C. § 707(a).

For the forgoing reasons, the court denies the motions to dismiss filed by the United States Trustee and Don Wright Realty.

**SO ORDERED.**

---

**11.** Because it pre-dates the changes made to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), this case discusses the "substantial abuse" standard of § 707(b). *Natale*, 136 B.R. at 352. BAPCPA changed the standard to only "abuse."